**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SYRACUSE MOUNTAINS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE BOLIVARIAN REPUBLIC OF VENEZUELA.<br><br>Defendant. | Civil Action No. 21-cv-02678 (AT) |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO VACATE THE DEFAULT JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)**

GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
Tel: (212) 801-9200

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 3

ARGUMENT .......... 7

I. EXTRAORDINARY CIRCUMSTANCES WARRANT GRANTING THE REPUBLIC RELIEF UNDER RULE 60(b)(6). .......... 7

A. The Republic's Default Was Not Willful. .......... 9

1. The Real Government Was Barred from Defending This Action. .......... 9
2. Service Was Directed Only to the Sham Guaidó Group, Not the Real Government of Venezuela. .......... 12
3. Upon Regaining Capacity and Recognition, the Republic Moved Promptly and in Good Faith. .......... 12

B. The Republic Has Meritorious Defenses. .......... 13
C. Vacating the Judgment Will Not Prejudice Plaintiff. .......... 21
D. The Republic's Motion is Timely. .......... 23

II. THE DEFAULT JUDGMENT ALSO IS VOID UNDER RULE 60(b)(4) BECAUSE SERVICE DID NOT COMPLY WITH THE FSIA. .......... 24
III. THE COURT SHOULD STAY ENFORCEMENT PENDING RESOLUTION OF THIS MOTION. .......... 26

CONCLUSION .......... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Altana Credit Opportunities Fund SPC v. Bolivarian Republic of Venezuela*,
No. 1:20-cv-08402 (S.D.N.Y.)....13

*American Alliance Ins. Co. v. Eagle Ins. Co.*,
92 F.3d 57 (2d Cir. 1996)....8, 10, 13

*Arpesella v. Bolivarian Republic of Venezuela*,
No. 1:23-cv-08929 (S.D.N.Y.)....13

*Bifolck v. Philip Morris USA Inc.*,
936 F.3d 74 (2d Cir. 2019)....16, 17

*BLOM Bank SAL v. Honickman*,
605 U.S. 204 (2025)....7, 9

*Casa Express Corp. v. Bolivarian Republic of Venezuela*,
492 F. Supp. 3d 222 (S.D.N.Y. 2020)....11, 17

*Cavara v. Bolivarian Republic of Venezuela*,
No. 1:25-cv-00165 (S.D.N.Y.)....13

*Chickpen, S.A. v. Bolivarian Republic of Venezuela*,
No. 1:21-cv-00597 (S.D.N.Y.)....13

*CITGO Petro. Corp. v. Ascot Underwriting Ltd.*,
158 F.4th 368 (2d Cir. 2025)....10

*Commercial Bank of Kuwait v. Rafidain Bank*,
15 F.3d 238 (2d Cir. 1994)....8, 19

*Contrarian Cap. Mgmt., LLC v. Bolivarian Republic of Venezuela*,
No. 1:19-cv-11018 (S.D.N.Y.)....13

*Covington Indus., Inc. v. Resintex A.G.*,
629 F.2d 730 (2d Cir. 1980)....24

*Davis v. Musler*,
713 F.2d 907 (2d Cir. 1983)....22

*Drywall Tapers & Pointers of Greater N.Y. Local Union 1974, IUPAT, AFL-CIO v. Creative Installations, Inc.*,
343 F.R.D. 358 (S.D.N.Y. 2022)....12

*Enron Oil Corp. v. Diakuhara*,
10 F.3d 90 (2d Cir. 1993)....8, 14, 22, 23

*FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*,
447 F.3d 835 (D.C. Cir. 2006)....11

*First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda–Permanent Mission*,
877 F.2d 189 (2d Cir. 1989)....8

*Flores v. El Bukanitas Inc.*,
2025 WL 3460744 (E.D.N.Y. Aug. 8, 2025)....12

*Fontana v. Republic of Argentina*,
415 F.3d 238 (2d Cir. 2005)....17, 18

*G&A Strategic Invs. I LLC v. Petróleos de Venezuela, S.A*,
2024 WL 4520067 (S.D.N.Y. Oct. 17, 2024)....3, 8, 12, 14, 22, 24

*Guaranty Tr. Co. of New York v. United States*,
304 U.S. 126 (1938)....10, 11

*Hilaturas Miel, S.L. v. Republic of Iraq*,
573 F. Supp. 2d 781 (S.D.N.Y. 2008)....25

*Hirshfeld v. Islamic Republic of Iran*,
235 F. Supp. 3d 45 (D.D.C. 2017)....25

*Irvin v. Harris*,
944 F.3d 63 (2d Cir. 2019)....24

*Jasper v. Sony Music Ent., Inc.*,
378 F. Supp. 2d 334 (S.D.N.Y. 2005)....16

*Knox v. Bank of N.Y.*,
508 F. Supp. 2d 249 (S.D.N.Y. 2007)....26

*Kreinik v. Showbran Photo, Inc.*,
400 F.Supp.2d 554 (S.D.N.Y. 2005)....17

*Lovati v. Bolivarian Republic of Venezuela*,
No. 1:19-cv-04793 (S.D.N.Y.)....13

*Lovati v. Bolivarian Republic of Venezuela*,
No. 1:19-cv-04796 (S.D.N.Y.)....13

*Mazzaccone v. Bolivarian Republic of Venezuela*,
No. 1:24-cv-06168 (S.D.N.Y.)....13

*Mazzaccone v. Bolivarian Republic of Venezuela*,
No. 1:24-cv-9114 (S.D.N.Y.)....13

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
863 F.3d 96 (2d Cir. 2017)....24

*Neuhauser v. Bolivarian Republic of Venezuela*,
No. 1:20-cv-10342, 2023 WL 4350614 (S.D.N.Y. July 3, 2023)....13, 19, 25

*New York v. Green*,
420 F.3d 99 (2d Cir. 2005)....8, 9, 22, 23, 24

*In re Orion HealthCorp, Inc.*,
95 F.4th 98 (2d Cir. 2024)....9

*Paraticuara LTDA. v. Bolivarian Republic of Venezuela*,
No. 1:24-cv-007738 (S.D.N.Y.)....13

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979)....16

*Pharo Gaia Fund, Ltd. v. Bolivarian Republic of Venezuela*,
No. 1:20-cv-8497, 2025 WL 1268864 (S.D.N.Y. May 1, 2025)....22, 23

*PRC Harris, Inc. v. Boeing Co.*,
700 F.2d 894 (2d Cir. 1983)....23

*Republic of Iraq v. ABB AG*,
768 F.3d 145 (2d Cir. 2014)....11

*Republic of Panama v. Air Panama Internacional, S.A.*,
745 F. Supp. 669 (S.D. Fla. 1988)....9, 10

*Republic of Sudan v. Harrison*,
587 U.S. 1 (2019)....24, 25

*Republic of Vietnam v. Pfizer, Inc.*,
556 F.2d 892 (8th Cir. 1977)....9, 10

*S.E.C. v. McNulty*,
137 F.3d 732 (2d Cir. 1998)....9, 10, 13

*Schafrann v. Republic of Venezuela*,
No. 01-cv-10637, 2002 WL 1766446 (S.D.N.Y. July 31, 2002)....20

*Shapiro v. Republic of Bolivia*,
930 F.2d 1013 (2d Cir. 1991)....24

*Socialist Republic of Romania v. Wildenstein & Co.*,
147 F.R.D. 62 (S.D.N.Y. 1993)....11

*Sony Corp. v. Elm State Elecs., Inc.*,
800 F.2d 317 (2d Cir. 1986)....8

*Syracuse Mountains Corp. v. Petróleos de Venezuela S.A.*,
No. 1:21-cv-2684, 2024 WL 3637997 (S.D.N.Y. Aug. 1, 2024)....2, 3, 4, 14, 15, 16, 17, 21

*In re Terrorist Attacks on Sept. 11, 2001*,
No. 03-md-01570, 2026 WL 1004493 (S.D.N.Y. Apr. 14, 2026)....24

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
30 F.3d 148 (D.C. Cir. 1994)....24

*Estate of Ungar v. Palestinian Auth.*,
344 F. App'x 631 (2d Cir. 2009)....26

*Venezuela US SRL v. Bolivarian Republic of Venezuela*,
178 F.4th 679 (D.C. Cir. 2026)....10

*VGB Limited v. Bolivarian Republic of Venezuela*,
No. 1:23-cv-09933 (S.D.N.Y. July 22, 2026)....7, 13

*Weisel v. Pischel*,
197 F.R.D. 231 (E.D.N.Y. 2000) .......... 13

*Wildflower + Co. v. Mood Apparel, Ltd.*,
338 F.R.D. 192 (S.D.N.Y. 2021) .......... 13

*Zahn v. Bolivarian Republic of Venezuela*,
No. 1:24-cv-9271, 2026 WL 2185589 (S.D.N.Y. July 29, 2026) .......... 13, 14

**State Cases**

*Altamira Investments II, SCSp v. Bolivarian Republic of Venezuela*,
No. 655341/2023 (N.Y. Sup. Ct.) .......... 13

*Brettler v. Allianz Life Ins. Co.*,
40 N.Y.3d 450, 226 N.E.3d 885 (2023) .......... 20

*Copernico Recovery Fund v. Bolivarian Republic of Venezuela*,
No. 656172/2023 (N.Y. Sup. Ct.) .......... 13

*Justinian Cap. SPC v. WestLB AG*,
28 N.Y.3d 160, 65 N.E.3d 1253 (2016) .......... 14, 16

**Federal Statutes**

28 U.S.C. § 1330(b) .......... 24, 26

28 U.S.C. § 1608 .......... 20

28 U.S.C. § 1608(a) .......... 24, 25, 26

28 U.S.C. § 1608(a)(1) .......... 5

28 U.S.C. § 1608(a)(2) .......... 5, 12

28 U.S.C. § 1608(a)(3) .......... 5, 6, 12, 25, 26

28 U.S.C. § 1608(a)(4) .......... 5, 25, 26

28 U.S.C. § 1608(e) .......... 19, 20, 24

**State Statutes**

N.Y. Jud. Law § 489(1) .......... 2, 14, 17

N.Y. Jud. Law § 489(2) .......... 2, 15, 17

**Rules**

Fed. R. Civ. P. § 60(b)(4) .......... 1, 3, 24

Fed. R. Civ. P. § 60(b)(6) .......... 1, 3, 7, 9, 10, 23, 24

Fed. R. Civ. P. § 60(c)(1) .......... 23

**Regulations**

31 C.F.R. § 591.312 ....................................................................................................21

84 Fed. Reg. 38,843 (Aug. 7, 2019)..............................................................................11

Pub. of Venezuela Sanctions Regulations Web General License 3 and Subsequent Iterations, 87 Fed. Reg. 62007 (Oct. 13, 2022) (codified at 31 C.F.R. pt. 591) ......................21

**Other Authorities**

Elizabeth Melimopoulos, *Venezuela Rocked by 7.5, 7.2 Earthquakes: What Happened and What We Know*, Al Jazeera (June 25, 2026), https://www.aljazeera.com/news/2026/6/25/venezuela-rocked-by-7-5-7-2-earthquakes-what-happened-and-what-we-know (last visited Oct. 2, 2026)............................7

Press Release, The White House, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela* (Jan. 23, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/ (last visited Oct. 2, 2026) .......................5

Press Statement, Ned Price, Spokesperson, U.S. Dep't of State, *Venezuela's Interim Government and the 2015 National Assembly* (Jan. 3, 2023), https://2021-2025.state.gov/venezuelas-interim-government-and-the-2015-national-assembly/ (last visited Oct. 2, 2026)...........................................................................5

Statement of Interest of the United States, *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 16 Misc. 405 (S.D.N.Y. Mar. 11, 2026)...................................7, 23

U.S. Statement of Interest, *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 1:19-CV-10023-KPF (S.D.N.Y. Aug. 29, 2025) .....................................................5

Defendant the Bolivarian Republic of Venezuela (the "Republic") respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rules of Civil Procedure 60(b)(4) and 60(b)(6), to vacate the Default Judgment entered against it on July 20, 2023 (ECF No. 49).

## PRELIMINARY STATEMENT

Given the highly unusual circumstances of this case involving changes to diplomatic recognition of a sovereign government, clear "reasons" exist under Rule 60(b)(6) to "justify relief" in the form of vacating the roughly $487 million default judgment against the Republic. That relief is supported by the strong federal policy favoring adjudication on the merits, which the case law recognizes is particularly appropriate in lifting a default judgment entered against a sovereign state. And the relief is further supported in this case by principles of collateral estoppel, as another court in this District held that Plaintiff engaged in unlawful champerty in litigating alleged bond defaults in entirely analogous circumstances. Plaintiff should not be allowed to escape the collateral estoppel consequences of that holding. Each of the elements for the equitable relief available under Rule 60(b)(6) are squarely met here.

*First*, the Republic's default was not willful. It did not ignore this litigation as a matter of choice. From 2013 until January 2026, Nicolás Maduro led the Republic's government in Caracas. However, by the time Plaintiff Syracuse Mountains Corporation ("Syracuse") filed suit in 2021 and obtained a default judgment in 2023, the United States had recognized a sham, parallel group as the country's government instead of the authorities that operated Venezuela's ministries, files, and legal apparatus. Thus, the entity with capacity to defend this action was prevented from doing so. A default compelled by internal U.S. politics and policy is not the "egregious" or "deliberate" conduct that Rule 60(b)(6)'s willfulness inquiry targets. Following the recent U.S. recognition of the current Caracas-based government, the Republic has moved promptly to defend numerous American lawsuits, including this action. Indeed, this is the first time since the recognition of the

government of President Decly Rodriguez that the Republic has an opportunity to appear in U.S. courts to defend itself.

*Second*, the Republic has legitimate defenses to assert in this case. In a parallel action brought on the same day by the same Plaintiff, Syracuse, against the Republic's state-owned oil company ("PDVSA"), summary judgment was granted finding that Plaintiff's acquisition of Venezuelan notes was illegally champertous under New York Judiciary Law § 489(1). *Syracuse Mountains Corp. v. Petróleos de Venezuela S.A.*, 2024 WL 3637997 (S.D.N.Y. Aug. 1, 2024) (Caproni, J.). The court held that no reasonable factfinder could conclude the transfers of the notes to Syracuse were made for *any purpose* other than bringing litigation, and that the Judiciary Law § 489(2) safe harbor did not apply because Plaintiff, a holding company with no independent assets or business, provided nothing of value in exchange for the notes. In light of that holding, Plaintiff is collaterally estopped from disputing champerty as the material facts pertaining to Plaintiff Syracuse's formation are identical, and because Plaintiff acquired the bonds at issue in both cases in materially the same manner. The Default Judgment also rests on Plaintiff's untested affidavits, and the Republic should be permitted discovery into whether Plaintiff is eligible for relief due to possible violations of U.S. law and whether Plaintiff has complied with contractual requirements for the transfer of its alleged beneficial bond interests and authorization to file this lawsuit.

*Third*, vacatur will not prejudice Plaintiff, which can make no showing that vacatur will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud. Mere delay does not suffice, and in any event, there is no delay of any kind in the record. Although Plaintiff obtained an order in April 2024 granting it leave "to seek attachment and execution of Venezuela's assets", the record reflects no effort by Plaintiff since to

execute on, levy against, register, or otherwise collect upon the Default Judgment. Plaintiff cannot claim prejudice from losing a collection advantage it has apparently never pursued.

Instructively, in *G&A Strategic Invs. I LLC v. Petróleos de Venezuela, S.A.*, 2024 WL 4520067 (S.D.N.Y. Oct. 17, 2024) (Rakoff, J.), another court of this District recently vacated more than $1.8 billion in default judgments against a Venezuelan state-owned entity under Rule 60(b)(6), finding "extraordinary circumstances" on key facts present here: staggering sums, no willful default, a colorable defense, and no prejudice. Because materially similar circumstances exist here, this nearly $500 million dispute should also be decided on its merits.

Finally, independent of these equitable grounds under Rule 60(b)(6), the Default Judgment also warrants vacatur under Rule 60(b)(4) because Plaintiff's service efforts did not comply with the Foreign Sovereign Immunities Act ("FSIA"). Pending resolution of this motion, the Court should exercise its discretion to stay enforcement of the judgment.

## STATEMENT OF FACTS

**The Bonds.** This is a breach-of-contract action to recover unpaid principal and interest on eleven series of bonds, with a stated principal amount of $327,347,000, that the Republic issued pursuant to three fiscal agency agreements (the "FAAs") dating from 1997, 1998, and 2001, all governed by New York law. (ECF No. 1 ¶¶ 1-2, 17-19.) Plaintiff is not a registered owner; the bonds are book-entry securities registered in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), and Plaintiff claims only a beneficial interest in them. (*Id.* ¶¶ 13-14.) Each bond series was in default no later than March 2018. (ECF No. 1 ¶ 23; ECF No. 40 ¶¶ 4–55; ECF No. 46, at 1.)

**The Plaintiff.** Plaintiff Syracuse is the same entity that sued PDVSA in *Syracuse Mountains Corp. v. Petróleos de Venezuela S.A.*, No. 21-cv-2684 (S.D.N.Y.) (the "PDVSA Proceeding"; citations to PDVSA Proceeding docket entries appear herein as "PDVSA ECF"

numbers) (*Compare* ECF No. 1, *with* PDVSA ECF No. 1.) In the PDVSA Proceeding, the court made extensive findings about Plaintiff on a full summary-judgment record.

With the assistance of the American law firm Hughes Hubbard & Reed ("HHR") and local Panamanian counsel, Plaintiff was incorporated in Panama on November 17, 2020, roughly four months before filing suit. *Syracuse Mountains*, 2024 WL 3637997, at *2. Plaintiff was formed by six non-party entities (the "Shareholders") each with different ultimate beneficial owner whose identity was filed under seal. *Id.* at *1; *see also* PDVSA ECF Nos. 135 at 1-2, 145. The court found that Plaintiff is "essentially a holding company" holding no assets but the transferred notes, conducting no business, earning no money, and not evening pay its own expenses (which the Shareholders cover). *Syracuse Mountains*, 2024 WL 3637997, at *2. Plaintiff exchanged no money for the long-since defaulted notes; it issued its own shares to the Shareholders pro rata to the face value each contributed and assumed no binding obligation to pay. *Id.* at *4-6. Plaintiff's own Rule 30(b)(6) witness admitted that Syracuse was incorporated for the sole purpose of litigation, i*d.* at *4, a fact corroborated by numerous emails. *See id*. at *5. Further, Plaintiff Syracuse's structure ran in part through the United States, as the Shareholders pooled their defaulted bonds in an account at Safra National Bank of New York and funded the litigation through U.S. counsel. (PDVSA ECF No. 131-15 at SM000980-83.)

**Pre-Default Judgment U.S. Diplomacy Decisions.** Hugo Chávez was the Republic's head of state until his death in 2013, when Nicolás Maduro succeeded him. On January 23, 2019,

the U.S. ceased to recognize President Maduro as Venezuela's head of state and instead recognized Juan Guaidó, the head of the so-called National Assembly, as the "interim" head of state.[1]

Thus, when Plaintiff filed suit on March 29, 2021, the United States did not recognize the real government of Venezuela, and instead recognized a sham, parallel group purporting to be led by Guaidó. In early January 2023, the United States accepted the dissolution of Guaidó's so-called interim government and shifted the purported duty to act for the Republic to the other members of the Guaidó group, the so-called National Assembly.[2]

**Service and Default.** No pleading was ever served on the real Venezuelan government; Plaintiff never attempted to serve the Republic at its Ministry of Foreign Affairs in Caracas. After filing suit (ECF No. 1), Plaintiff obtained leave to serve the Republic exclusively through the U.S. Secretary of State through diplomatic channels under 28 U.S.C. § 1608(a)(4), representing to this Court on April 13, 2021 that the first three statutory methods under (§ 1608(a)(1)-(3) were unavailable based on largely on public positions taken by the sham Guaidó regime instead of by actually attempting service. (*See* ECF No. 12 at 2-3; ECF No. 14 (order dated April 14, 2021 granting leave to serve).) Plaintiff represented that service under § 1608(a)(2) "would require the Court to recognize the actions and decrees of the Maduro regime, in contravention to the

---

[1] Press Release, The White House, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela* (Jan. 23, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/ (last visited Oct. 2, 2026); *see* U.S. Statement of Interest, *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 1:19-CV-10023-KPF (S.D.N.Y. Aug. 29, 2025), ECF No. 393, Ex. A at 2.

[2] Press Statement, Ned Price, Spokesperson, U.S. Dep't of State, *Venezuela's Interim Government and the 2015 National Assembly* (Jan. 3, 2023), https://2021-2025.state.gov/venezuelas-interim-government-and-the-2015-national-assembly/ (last visited Oct. 2, 2026).

Executive's exclusive recognition of Juan Guaidó," and that mail service to the foreign minister under § 1608(a)(3)) "appears to be 'categorically unavailable.'" (ECF No. 12, at 2-3.)

On May 21, 2021, the Clerk sent the summons, Complaint, and related papers to the Secretary of State. (ECF No. 19.) A State Department diplomatic note reflects that the papers were delivered to the Venezuelan Embassy in Washington, D.C. on February 9, 2022. (ECF No. 33-1.) At that time, the Washington embassy was controlled by the Guaidó group, not the real Venezuelan authorities that operated Venezuela's ministries in Caracas. After the Republic did not appear, the Clerk entered a Certificate of Default on April 12, 2022. (ECF No. 38.) The Republic is unaware of whether the Guaidó group ever received actual notice of this action, and, if it did, of why it failed to appear.

**Entry of the Default Judgment.** On July 20, 2023, when the U.S. government no longer recognized Guaidó, the Court entered the Default Judgment, awarding Plaintiff a total of $486,893,082.17 in unpaid principal, accrued contractual interest, statutory prejudgment interest, and fees across the eleven series. (ECF No. 49.) The Default Judgment was transmitted to the Republic through the same State Department channel: the Clerk mailed it on August 25, 2023, and the State Department confirmed delivery on January 13, 2024. (ECF No. 53 ¶¶ 4-5.) Nothing in the record reflects that the Default Judgment reached the real Venezuelan government.

**Enforcement.** The record reflects a single step by Plaintiff toward collection and no actual recovery. In March 2024, Plaintiff sought "leave to seek attachment and execution of Venezuela's assets." (ECF Nos. 51-52.) The Court granted that unopposed motion on April 1, 2024. (ECF No. 54.) Beyond obtaining leave, the record does not reflect that Plaintiff has registered its judgment in Delaware, levied on or attached any property, pursued post-judgment discovery, or engaged in any collection efforts.

**Post-Default Judgment U.S. Diplomacy Decisions.** In March 2026, Acting President Delcy Rodríguez obtained U.S. recognition as the legitimate government of Venezuela. *See* Statement of Interest of the United States, *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 16 Misc. 405 (S.D.N.Y. Mar. 11, 2026), ECF No. 621 at 1.

The Republic immediately started to identify potential U.S. counsel to represent it in dozens of U.S. lawsuits. This process was further inhibited by the twin earthquakes taking place in late June 2026 that created a humanitarian crisis prompting the Rodríguez government to issue a state of emergency.[3] The process of retaining counsel remained ongoing in late July 2026. *VGB Limited v. Bolivarian Republic of Venezuela*, No. 1:23-cv-09933-AT (S.D.N.Y. July 22, 2026), ECF No. 40, at 1. The current government has thus promptly moved to defend Venezuela's interests in U.S. litigation. With specific regard to this matter, the Republic swiftly retained new counsel who now move to vacate.

## ARGUMENT

### I. EXTRAORDINARY CIRCUMSTANCES WARRANT GRANTING THE REPUBLIC RELIEF UNDER RULE 60(b)(6).

Rule 60(b)(6) authorizes relief for "any other reason that justifies relief" beyond those otherwise set forth in Rule 60(b), and its equitably flexible reach applies to the types of "extraordinary circumstances" present here. *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 210 (2025). In deciding a motion to vacate a default judgment pursuant to Rule 60(b)(6), "courts generally examine three criteria to determine whether to vacate a judgment: (1) whether the default was willful; (2) whether defendant has a meritorious defense; and (3) the level of prejudice that

---

[3] Elizabeth Melimopoulos, *Venezuela Rocked by 7.5, 7.2 Earthquakes: What Happened and What We Know*, Al Jazeera (June 25, 2026), https://www.aljazeera.com/news/2026/6/25/venezuela-rocked-by-7-5-7-2-earthquakes-what-happened-and-what-we-know (last visited Oct. 2, 2026).

may occur to the non-defaulting party if relief is granted." *American Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir. 1996) (citations omitted) (vacating default). Those factors are considered in light of the Second Circuit's "strong preference for resolving disputes on the merits," and the Court's acknowledgment that a default judgment is "the most severe sanction which the court may apply," and considering that "all doubts must be resolved in favor of the party seeking relief." *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005) (citations omitted). Indeed, these criteria "should be construed generously" and the Court may also consider "whether the entry of default would bring about a harsh or unfair result." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993). Here, the element of a meritorious defense is open-and-shut, since Plaintiff's claims in the highly analogous PDVSA Proceeding seeking recovery on similar bonds was rejected on grounds of champerty.

The presumption against default judgments is especially strong when, as here, the judgment is entered against a foreign sovereign. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 240 (2d Cir. 1994) ("[D]efault judgments are disfavored, especially those against foreign sovereigns"); *First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda–Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989) ("Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside."). It would defy the interests of justice in these circumstances to deprive a sovereign state of its capacity to assert a clearly warranted defense under collateral estoppel principles. Default judgments are further disfavored when, as here, "large sums of money [a]re involved." *G&A Strategic Investments*, 2024 WL 4520067, at *3 (citing *Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986)). As shown below, vacatur is warranted because the Republic's default was not willful, it has numerous meritorious defenses, and vacatur will not prejudice Plaintiff.

### A. <u>The Republic's Default Was Not Willful.</u>

The touchstone of the analysis under Rule 60(b)(6) is the movant's lack of willfulness: relief is warranted where the party's predicament was not the product of "free, calculated, deliberate choices." *BLOM Bank*, 605 U.S. at 212 (citations omitted). As such, willfulness is the most heavily weighted factor, *In re Orion HealthCorp, Inc.*, 95 F.4th 98, 104 (2d Cir. 2024), and it is not satisfied here. A default is willful only where the defendant's conduct is "egregious" or "deliberate" and "not satisfactorily explained"; it must be something more than mere negligence. *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998); *Green*, 420 F.3d at 108.

#### 1. The Real Government Was Barred from Defending This Action.

The Republic's failure to appear was neither egregious nor deliberate; it was the product of a unique constitutional and geopolitical rupture and of U.S. laws and regulations beyond its control. The Venezuelan Government now before the Court was legally barred from appearing until March 2026. *Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 676 (S.D. Fla. 1988) ("Only governments recognized by the United States are entitled to access to United States courts"). The sham governments previously recognized by the U.S. between the 2021 filing of the lawsuit and the 2023 default judgment were different sovereign administrations whose litigation posture cannot fairly be charged to the movant as willful defiance.

The default thus did not reflect a "deliberate" litigation choice by a party able to defend, but a disqualification imposed by the U.S. Executive Branch's recognition policy—a policy Plaintiff itself invoked to obtain its chosen method of service. (ECF No. 12, at 2-3.) In March 2026, the United States lifted that disqualification by recognizing the current Venezuelan government, which has promptly appeared. A court confronting a change in the recognized government has discretion to adjust the litigation to reflect the new reality, including by realigning parties or permitting the recognized government to be heard. *Republic of Vietnam v. Pfizer, Inc.*,

556 F.2d 892, 894 (8th Cir. 1977) ("While executive action pertaining to the recognition or nonrecognition of a foreign government is binding on the courts, the courts are nevertheless free to determine the legal consequences of that executive action upon pending litigation"). That is precisely the relief Rule 60(b)(6) empowers the Court to grant and even if the Court concludes that default judgment was proper in 2023, it should conclude that vacatur is proper now.

This is not a case, like those finding willfulness, in which a defendant with actual notice "purposely evaded service" (*McNulty*, 137 F.3d at 739) or made "a strategic decision to default." *American Alliance*, 92 F.3d at 60. The Caracas-based government's inability to defend against this action was not its choice; it was the product of the United States' "interim" recognition decisions, since changed, which were binding on this Court. Which government is recognized to represent a foreign state "is a political rather than a judicial question," and the Executive's recognition decision "is conclusive on all domestic courts, which are bound to accept that determination." *Guaranty Tr. Co. of New York v. United States*, 304 U.S. 126, 137-38 (1938); *Republic of Panama*, 745 F. Supp. at 674; *accord CITGO Petro. Corp. v. Ascot Underwriting Ltd.*, 158 F.4th 368, 386, 388-89 (2d Cir. 2025). It follows that suit on a foreign state's behalf "may be maintained . . . only by that government which has been recognized by the political department of our own government," *Guaranty Trust*, 304 U.S. at 137, and, conversely, that "agents and instrumentalities of unrecognized governments are denied access to United States courts." *Republic of Panama*, 745 F. Supp. at 676. The principles espoused in *Guaranty Trust* remain the law. *Venezuela US SRL v.*

*Bolivarian Republic of Venezuela*, 178 F.4th 679, 683 (D.C. Cir. 2026) (quoting *Guaranty Trust* regarding recognition binding courts).[4]

Even if the real Venezuelan government had been permitted to appear in U.S. court, US. law would have prevented its mounting of a defense. Executive Order 13,884 blocked "all property and interests in property of the Government of Venezuela that are in the United States" (84 Fed. Reg. 38,843 (Aug. 7, 2019)), and U.S. law regulations barred dealings in that property absent a specific license. *Casa Express Corp. v. Bolivarian Republic of Venezuela*, 492 F. Supp. 3d 222, 228-29 (S.D.N.Y. 2020). When the Default Judgment was entered, the U.S. Executive Branch recognized only the sham Guaidó group and prevented the real government from appearing in U.S. courts. Those measures would have made it structurally difficult, if not impossible, for the real government to transfer funds to retain counsel. Courts recognize that a foreign state's failure to respond is excusable, and not willful, where it is "in considerable measure out of the [sovereign's] control" due to "substantial political and institutional" disruption. *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835, 840-41 (D.C. Cir. 2006).

---

[4] In inapposite circumstances, a standard transition in governmental authority is not an extraordinary circumstance because, unlike here, a successor government typically is in privity with its predecessor. *Socialist Republic of Romania v. Wildenstein & Co.*, 147 F.R.D. 62, 66 (S.D.N.Y. 1993); *Republic of Iraq v. ABB AG*, 768 F.3d 145, 165-66 (2d Cir. 2014). But those cases involved internal transitions within a single, continuously recognized state: a government that always had capacity to appear and simply changed hands. This case involves the opposite—a change in which government the United States recognized as capable of appearing at all. The predecessor here was not a government that chose to litigate differently; it was a government the Executive had displaced from access to this Court. That is the rare circumstance in which the privity rationale does not attach, because the party now before the Court never had, and was legally forbidden from having, a voice in the default.

### 2. Service Was Directed Only to the Sham Guaidó Group, Not the Real Government of Venezuela.

A defendant's lack of actual notice of an action, even where service was properly effected, can support a finding that its default was not willful. *See Drywall Tapers & Pointers of Greater N.Y. Local Union 1974, IUPAT, AFL-CIO v. Creative Installations, Inc.*, 343 F.R.D. 358, 364 (S.D.N.Y. 2022); *accord Flores v. El Bukanitas Inc.*, 2025 WL 3460744, at *3 (E.D.N.Y. Aug. 8, 2025); *cf. G&A Strategic Investments*, 2024 WL 4520067, at *2-3. That principle is decisive here.

The record confirms that no notice of this action—formal or actual—was ever provided to the real government of Venezuela. Every transmittal of process in this case ran exclusively through the diplomatic apparatus of the U.S.-recognized so-called "interim" government. The summons and Complaint were transmitted through diplomatic channels and delivered to the Venezuelan Embassy in Washington, D.C.—an embassy then controlled by the Guaidó group. (ECF No. 19; ECF No. 37 ¶ 5; ECF No. 33-1.) The Default Judgment was later transmitted through that same channel. (ECF No. 53 ¶¶ 4-5.) Nothing in the record reflects that the pleadings or the judgment ever reached the real government in Caracas. That absence is no accident. The one method of service that could have delivered process to that government, service on the Venezuelan Ministry of Foreign Affairs in Caracas under 28 U.S.C. § 1608(a)(2)-(3), was foregone as unavailable, precisely because resorting to it "would require the Court to recognize the actions and decrees of the Maduro regime, in contravention to the Executive's exclusive recognition of Juan Guaidó." (ECF No. 12, at 2-3.) Thus, nothing in the record indicates a willful default by the real Venezuelan government.

### 3. Upon Regaining Capacity and Recognition, the Republic Moved Promptly and in Good Faith.

The Republic's conduct following President Rodríguez's recognition demonstrates its good faith and willingness to defend against this action. Since the recent U.S. Executive Branch

recognition and resulting ability to appear in U.S. litigation, the Republic has not sat on its rights. It very recently has appeared and participated in U.S. litigation to protect Venezuelan assets, including many cases in this District and in state court in Manhattan.[5] The Republic recently retained counsel in this matter who are filing this motion as their first appearance. This prompt, constructive engagement is the opposite of the "egregious" and unexplained conduct that supports a willfulness finding, and it confirms that the 2023 default was a product of the prior period of geopolitical gridlock, not a considered decision to defy this Court.

**B. <u>The Republic Has Meritorious Defenses.</u>**

To satisfy the meritorious defense requirement, the Republic "need not establish [its] defense conclusively"; it need only "present evidence of facts that, if proven at trial, would constitute a complete defense." *McNulty*, 137 F.3d at 740 (citations omitted). The defense "need not be ultimately persuasive at this stage"; it is enough that the defense "give the factfinder some determination to make." *American Alliance*, 92 F.3d at 61 (citations omitted). "Likelihood of success is not the measure"; a defense is meritorious if it contains "even a hint of a suggestion" which, if proven at trial, would constitute a complete defense. *Weisel v. Pischel*, 197 F.R.D. 231, 239 (E.D.N.Y. 2000) (citations omitted). The defaulting party thus "need only meet a low threshold to satisfy this factor." *Wildflower + Co. v. Mood Apparel, Ltd.*, 338 F.R.D. 192, 198 (S.D.N.Y. 2021) (citations omitted). This standard "should be construed generously" because "[d]efault

---

[5] *See, e.g.*, *Altana Credit*, No. 1:20-cv-08402 (S.D.N.Y.); *Arpesella*, No. 1:23-cv-08929 (S.D.N.Y.); *Cavara*, No. 1:25-cv-00165 (S.D.N.Y.); *Chickpen*, No. 1:21-cv-00597 (S.D.N.Y.); *Contrarian Cap.*, No. 1:19-cv-11018 (S.D.N.Y.); *Lovati* [I], No. 1:19-cv-04793 (S.D.N.Y.); *Lovati* [II], No. 1:19-cv-04796 (S.D.N.Y.); *Mazzaccone* [I], No. 1:24-cv-06168 (S.D.N.Y.); *Mazzaccone* [II], No. 1:24-cv-9114 (S.D.N.Y.); *Neuhauser*, No. 1:20-cv-10342 (S.D.N.Y.); *Paraticuara LTD*, No. 1:24-cv-007738 (S.D.N.Y.); *VGB Limited*, No. 1:23-cv-09933 (S.D.N.Y.); *Zahn*, No. 1:24-cv-9271 (S.D.N.Y.); *Altamira Investments*, No. 655341/2023 (N.Y. Sup. Ct.); *Copernico Recovery Fund*, No. 656172/2023 (N.Y. Sup. Ct.).

judgments 'are generally disfavored and are reserved for rare occasions.'" *Enron Oil*, 10 F.3d at 96 (quotation omitted). Based on its ongoing evaluation, the Republic has identified a number of defenses that more than meet this standard, including champerty, which should allow the Republic to prevail completely in this action, if revived, at the summary judgment stage.

**Champerty.** New York Judiciary Law § 489(1) prohibits any "corporation or association," and any person "engaged directly or indirectly in the business of collection and adjustment of claims," from taking an assignment of a bond or other "thing in action . . . with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. Jud. Law § 489(1) (McKinney 2020). An assignment that violates the statute is void. *Zahn v. Bolivarian Republic of Venezuela*, 2026 WL 2185589, at *6 (S.D.N.Y. July 29, 2026). To be champertous, "the *primary purpose* of the purchase must be to enable [one] to bring a suit, and the intent to bring a suit must not be merely incidental and contingent." *Justinian Cap. SPC v. WestLB AG*, 28 N.Y.3d 160, 166–67, 65 N.E.3d 1253 (2016). A court of this District recently found this defense merely "sufficiently colorable" to support vacatur where a plaintiff purchased defaulted Venezuelan notes "in default and for nominal value" for the possibly "primary purpose" of suit. *G&A Strategic Investments*, 2024 WL 4520067, at *3. The "critical issue" is "the purpose behind the plaintiff's acquisition of rights," which is "usually a factual one." *Zahn*, 2026 WL 2185589, at *6.

Here, the Republic's champerty defense is not merely colorable (which is what is required), it already has been sustained against this Plaintiff on a full evidentiary record. In the parallel PDVSA Proceeding, the court granted summary judgment against the Plaintiff, holding that Plaintiff's acquisition champertous and void under § 489. *Syracuse Mountains*, 2024 WL 3637997, at *4-8. Construing the record in Plaintiff's favor, the court found that "no reasonable fact finder could conclude other than that the transfers were made for the purpose of litigation and, therefore,

were champertous." *Id.* at *5. The transfers' purpose was litigation and litigation alone: Plaintiff Syracuse was incorporated on November 17, 2020, just four months before suit; its counsel HHR was already drafting the complaint while the note transfers were underway; and Plaintiff's own Rule 30(b)(6) witness admitted that Plaintiff "was incorporated just for the purpose of this litigation." *Id.* at *4.

Although that testimony was given in the PDVSA Proceeding, the single-purpose vehicle it describes is the same Plaintiff that sued the Republic here. Plaintiff was formed as one vehicle to pool the Shareholders' defaulted Venezuelan bonds, including both their PDVSA notes and the Republic bonds at issue in this action, into a single account, and it filed suit against PDVSA and the Republic on the same day, through the same counsel. *See* PDVSA ECF No. 131-15 at SM000980-SM000981 (November 2020 e-mails arranging to "join all our bonds in this account" held by Plaintiff at Safra National Bank of New York as a "[c]apital contribution," and to fund "the first phase of HHR (the attorneys leading the litigation)"); *compare* ECF No. 1, *with* PDVSA ECF No. 1). The complaint in this case was being prepared in early January 2021. (ECF No. 48-1, at 2–4.) Although the (pre-discovery) record in this case does not reflect when the Venezuelan bond interests were transferred into Plaintiff's Safra bank account, such transfers must have occurred after Plaintiff's November 2020 incorporation, only weeks before. Discovery might show that Plaintiff acquired its Republic bond interests *after* HHR began working on the complaint. Because Plaintiff holds no assets other than the transferred notes and conducts no other business, *Syracuse Mountains*, 2024 WL 3637997, at *2, the "litigation" for which it was "incorporated" necessarily encompasses this action.

In the PDVSA Proceeding, the court further held that the § 489(2) safe harbor inapplicable because Plaintiff gave no value for the notes—it issued only shares in itself, a holding company

whose sole assets were the transferred notes—and thus assumed none of the $500,000 risk the safe harbor requires. *Id.* at *6-7; *see Justinian Cap. SPC v. WestLB AG*, 28 N.Y.3d 160, 169-71, 65 N.E.3d 1253 (2016) (safe harbor demands a "binding and bona fide obligation to pay" at least $500,000 and real "skin in the game"). And because Plaintiff was created years after the notes were first purchased and months before it sued, it held no "preexisting proprietary interest" in the notes and was a "stranger" to the underlying debt, foreclosing the exception for assignees enforcing their own rights. *Id.* at *5.

Because Plaintiff litigated and lost those issues, it is now collaterally estopped from disputing them again even though its complaint in this case named a different Venezuelan obligor. "[D]efensive collateral estoppel precludes a plaintiff from getting a second bite at the apple merely by choosing a new adversary." *Jasper v. Sony Music Ent., Inc.*, 378 F. Supp. 2d 334, 343 (S.D.N.Y. 2005) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979)). Collateral estoppel applies where (1) the issue is identical to one necessarily decided in the prior action and decisive here, (2) the issue was actually litigated and decided, (3) its resolution was necessary to a valid and final judgment, and (4) the party to be estopped had a full and fair opportunity to litigate it. *Bifolck v. Philip Morris USA Inc*., 936 F.3d 74, 79-80 (2d Cir. 2019). Elements (2)-(4) are plainly satisfied: the same champerty issue was fully litigated by the Plaintiff, and because resolution of the champerty issue formed the entire basis for the grant of summary judgment in the PDVSA Proceeding, the issue was conclusively decided and resolution of the issue was necessary to the valid and final judgment reached there.

While Plaintiff may argue that element (1) is not satisfied because this case involves different bonds and because champertous intent is a fact-intensive inquiry that must be made as to each bond, that argument would fail. The PDVSA court resolved a series of facts about Plaintiff

itself—not about any particular note—that are dispositive of both champertous intent under § 489(1) and the inapplicability of the § 489(2) safe harbor: Plaintiff is a holding company incorporated on November 17, 2020 for the sole purpose of litigation with no employees, offices, property, business, or assets other than the debt transferred to it that it gave no value for the debt, issuing only its own shares and assuming no binding obligation to pay. *Syracuse Mountains*, 2024 WL 3637997, at *2-4. The precise date on which the Venezuelan bonds were transferred to Plaintiff is therefore immaterial; whether the transfer occurred the day Plaintiff was incorporated or any day thereafter, the result is the same. "[T]he identity element does not require that the issues be exactly identical, and courts instead have held that two issues may be identical for estoppel purposes if they are substantially or essentially the same." *Kreinik v. Showbran Photo, Inc.*, 400 F.Supp.2d 554, 562 (S.D.N.Y. 2005) (giving collateral estoppel effect in an ERISA case to a jury determination that a person was not an employee under New York state law) (collecting cases). Where an issue concerns "only the existence or non-existence of certain facts," it "need only deal with the same past events . . . to be considered identical." *Bifolck*, 936 F.3d at 81 (quotation omitted). The champerty issue here is therefore identical for estoppel purposes to the one necessarily decided in the PDVSA Proceeding because the controlling determinations turn on Plaintiff's structure and purpose, not claims based on the transfer of specific bonds.

**Standing and authorization to sue.** Under the FAAs, so long as the Depository's nominee (Cede & Co.) is the registered holder, it "will be considered the sole owner or holder" of the bonds, and beneficial owners "will not be considered the owners or holders." *Fontana v. Republic of Argentina*, 415 F.3d 238, 239-41 (2d Cir. 2005). A beneficial owner therefore ordinarily "must receive authorization from the registered holder of the bond before it may sue." *Casa Express*, 492 F. Supp. 3d at 230. Relying on untested declarations from Plaintiff's counsel, Michael A.

DeBernardis, and its representative, Viviana Raquel Degracia, on July 5, 2023, the Court found that Plaintiff had standing to file suit on the basis that it "has authorization from the record holders of the Bonds to bring this action," and granted default judgment. (ECF No. 46, at 4 (citing DeBernardis Decl. ¶ 109 & ECF Nos. 41-41, 41-42).) The Republic should be permitted to test Plaintiff's evidence of authorization. In *Fontana*, the Second Circuit vacated summary judgment for beneficial owners of defaulted sovereign bonds where the submitted intermediary letters did not explicitly authorize the plaintiffs to sue and the plaintiffs had not shown that DTC or Cede had authorized the intermediary to act. *Fontana*, 415 F.3d at 241-42.

The letters Plaintiff submitted are inadequate standing alone. Ten of the eleven series rest on form letters from Cede & Co., each authorizing Syracuse to act "solely to the extent" it holds the beneficial interest, reciting that Cede & Co. acts "solely at the request of the Participant, acting on behalf of the Client, and only as a nominal party," and disclaiming any further role: Cede & Co. "assumes no further responsibility in this matter." (ECF No. 41-41.) The letters do not independently establish Plaintiff's beneficial ownership; they are expressly contingent on Plaintiff's own untested representation that it holds the interest. Nor does the chain of custody close the gap: Cede & Co. acted only on what "DTC is informed by its participant," Safra Securities LLC, which held as custodian for Safra National Bank of New York, which in turn held as custodian for Plaintiff. (*Id.*) The letters memorialize a multi-link, untested custodial chain; they do not show that each intermediary was authorized to pass the right to sue down that chain, or that Plaintiff acquired and holds valid beneficial interests in compliance with the FAAs' transfer and certification requirements.

The authorization for the remaining series, the 13.625% 2018 RegS Bonds, is weaker still. It comes not from Cede & Co. as the DTC record holder, but from Safra Securities LLC, purporting

to authorize Syracuse to act "as the holder of the Notes before Clearstream Banking S.A." (ECF No. 41-42.) Safra Securities furnished that authorization only "at the request of SNBNY and the Client," disclaimed any independent interest, and stated that it "assume[d] no responsibility in this matter." (*Id.*) Whether Safra Securities was the registered holder or was itself authorized by the registered holder to confer on Plaintiff the right to sue on a Regulation S note held through Clearstream was never tested and, if resolved against Plaintiff, would defeat standing on that series. The letters are not even internally consistent with the judgment—the Cede & Co. letter for the 11.95% 2031 Bonds recites a record holding of "USD 26,500,000" but authorizes action only as to "USD 26,250,000" (ECF No. 41-41)—thus providing an additional basis for discovery.

**The § 1608(e) evidentiary basis is contestable.** Because Plaintiff sued a foreign state, the Default Judgment could be entered only on "evidence satisfactory to the court," 28 U.S.C. § 1608(e)—a heightened protection, modeled on the safeguard against unfounded default claims that the United States enjoys, as "the public fisc should be protected from claims that are unfounded but would be granted solely because the government failed to make a timely response." *Commercial Bank of Kuwait*, 15 F.3d at 242 (quotation omitted). Under § 1608(e), "the Court cannot 'unquestioningly accept a complaint's unsupported allegations as true,' . . . but rather, it must require that the plaintiff set forth "uncontroverted factual allegations, which are supported by. . . documentary and affidavit evidence.'" *Neuhauser v. Bolivarian Republic of Venezuela*, 2023 WL 4350614, at *2-3 (S.D.N.Y. July 3, 2023) (citations omitted) (Torres, J.).

In an instructive decision, another court in this District denied a motion for a default judgment on Venezuelan bonds because the plaintiff "provide[d] no documentary or affidavit evidence" that it had obtained authorization to sue from the record holder, and the Court therefore "[could not] conclude" that the plaintiff had contractual standing. *Neuhauser*, 2023 WL 4350614,

at *3. Another court likewise denied a default judgment against the Republic where the claimant's proof of an allegedly amended contract, based on unanswered letters, was not "satisfactory" under § 1608(e), especially "[i]n light of the strong policy against default judgments against foreign sovereigns." *Schafrann v. Republic of Venezuela*, 2002 WL 1766446, at *2 (S.D.N.Y. July 31, 2002). Here, the Court found standing and authorization on the untested declaration of Plaintiff's counsel and its exhibits. (ECF No. 46, at 4.) If the Republic is permitted to contest that evidence, the deficiency that defeated the claimants in *Neuhauser* and *Schafrann* may defeat judgment here. And, as argued in Part II, *infra*, the Republic submits that the Court should also reconsider whether the § 1608 service prerequisites were satisfied.

**Compliance with the FAAs' transfer requirements.** The FAAs condition an effective transfer of a beneficial interest on specified procedures. Eight of the eleven series—including the 13.625% 2018 RegS Bonds, the 7.00% 2018 Bonds, and the 9.00% 2023 Bonds—were issued under the FAA dated as of July 25, 2001 (ECF No. 1 ¶ 22), and Section 6 of the 2001 FAA governs the registration of the bonds and conditions a valid transfer on compliance with specified certification, registration, and instruction requirements. (ECF No. 41-32 (2001 FAA) § 6.) Under New York law, a transfer that fails to satisfy a contractual condition on transferability is unenforceable against the obligor. *Brettler v. Allianz Life Ins. Co.*, 40 N.Y.3d 450, 455-57, 226 N.E.3d 885 (2023). Whether Plaintiff acquired its interests in compliance with those conditions was never tested and, if resolved against Plaintiff, potentially would be a complete defense.

**Violation of U.S. Laws and Regulations**. If the judgment is vacated, the Republic would request discovery into Plaintiff's ownership and ownership structure to investigate whether Syracuse was created, in whole or in part, to evade U.S. laws and regulations governing investments in Venezuelan bonds. During the relevant period, U.S. law prohibited "U.S. Persons"

from directly or indirectly purchasing or investing in, or facilitating the purchase of or investment by U.S. Persons in, Venezuelan bonds.[6] The definition of "U.S. Person" is broad, reaching "any person in the United States" regardless of citizenship or residence, as well as U.S. citizens and residents, wherever they are located. 31 C.F.R. § 591.312. As a Panamanian holding company (ECF No. 1 ¶ 5), Plaintiff Syracuse's structure superficially enabled its investors to transfer its Republic bond interests to a non-U.S. entity.

An inquiry into who falls under the "U.S. Person" definition is thus necessary but currently impossible on the public record. Plaintiff is owned by six Shareholders, each held by a different unofficial beneficial owner whose identity was filed under seal in the PDVSA action. *Syracuse Mountains*, 2024 WL 3637997, at *1-2; (PDVSA ECF Nos. 135 at 1-2, 145.) The public record therefore does not disclose whether any investor in, or member of the management of, Plaintiff is a U.S. citizen, a U.S. resident, or otherwise a "U.S. Person." The record, however, unequivocally shows that Plaintiff routed the defaulted bonds through a pooled account at Safra National Bank of New York and funded the litigation through U.S. counsel. (PDVSA ECF No. 131-15 at SM000980-83.) Those facts are directly relevant to whether Plaintiff or its investors used the Syracuse structure to acquire blocked Venezuelan bonds in circumvention of U.S. law, and to whether Plaintiff may lawfully collect on any judgment. Having had no discovery, the Republic should be permitted to develop that record.

### C. Vacating the Judgment Will Not Prejudice Plaintiff.

The final factor also favors vacatur. No cognizable prejudice would ensue from vacatur because Plaintiff cannot show that vacatur "will result in the loss of evidence, create increased

[6] Pub. of Venezuela Sanctions Regulations Web General License 3 and Subsequent Iterations, 87 Fed. Reg. 62007 (Oct. 13, 2022) (codified at 31 C.F.R. pt. 591).

difficulties of discovery, or provide greater opportunity for fraud and collusion." *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983). This is a documentary breach-of-contract case; the operative facts are memorialized in the FAAs, the bonds, and the parties' records, so vacatur does not risk loss of evidence or impediment to discovery. Nor is the delay attributable to gamesmanship; it reflects the U.S. recognition decisions described above.

That vacatur would, in theory, delay Plaintiff's collection efforts during the pendency of this motion does not constitute prejudice under Rule 60(b), and here there are no meaningful collection efforts to delay. Prejudice requires more than mere delay or the passage of time. *Green*, 420 F.3d at 110 ("delay alone is not a sufficient basis for establishing prejudice . . . something more is needed"); *Enron Oil*, 10 F.3d at 98 ("delay standing alone does not establish prejudice"). The loss of an enforcement advantage secured through a one-sided default is not the kind of prejudice that defeats a motion to vacate; if it were, no default judgment could ever be reopened. In *G&A Strategic Investments*, the court rejected an argument that vacatur would prejudice bondholders in a parallel Delaware enforcement proceeding, explaining that any such effect "would only be by the effect of plaintiffs' litigation strategy, for which th[e] Court can bear no responsibility." 2024 WL 4520067, at *3. The lack of prejudice is particularly manifest here, because although Plaintiff obtained leave to seek attachment and execution, the record reflects no actual effort to collect in the period since the Default Judgment was entered.

The experience of a comparable judgment creditor in this Court is instructive. The comparison to *Pharo* is one this Court has already drawn: in granting Plaintiff leave to enforce, the Court looked to *Pharo*, which it described as "a related case." (ECF No. 54, at 2.) In October 2021, the plaintiffs in *Pharo Gaia Fund, Ltd. v. Bolivarian Republic of Venezuela* obtained a default judgment against the Republic for approximately $1.4 billion. 2025 WL 1268864, at *1

(S.D.N.Y. May 1, 2025) (Torres, J.). Those plaintiffs registered their judgment in Delaware federal court, sought to enforce it, and engaged in post-judgment discovery. *Id.* Even so, they came to learn that they stood behind "preceding Plaintiffs [who] hold approximately $18 billion in judgments." *Id.* And the judgment itself "had the practical effect of making it more difficult for them to transfer or otherwise deal efficiently with the underlying bonds," because the merger of the debt into the judgment rendered the bonds "not fungible with bonds that are not subject to a judgment." *Id.* at *2. After years of fruitless enforcement efforts, the *Pharo* plaintiffs moved under Rule 60(b)(6) to vacate the judgment they had obtained and to dismiss the underlying claims without prejudice under Rule 41(a)(2), and this Court granted the motion. *Id.* at *3. If a judgment creditor that actively pursued enforcement for years suffered no cognizable prejudice from vacatur, Plaintiff, which has not, suffers none either.

Plaintiff Syracuse is a sophisticated actor that acquired defaulted paper with litigation risk priced in. Its place in the line of Venezuela's creditors is not the kind of cognizable prejudice that outweighs the Republic's right, and the strong federal policy, to a decision on the merits. *See Enron Oil*, 10 F.3d at 95. Against the Second Circuit's command that "all doubts must be resolved in favor of the party seeking relief," *Green*, 420 F.3d at 104, the absence of *any* cognizable prejudice here is significantly outweighed by the interest in adjudicating an approximately $487 million claim against a foreign sovereign on its merits.

### D. <u>The Republic's Motion is Timely.</u>

A Rule 60(b) motion must be made "within a reasonable time." Fed. R. Civ. P. 60(c)(1). This standard requires the Court to "balance the interest in finality with the reasons for delay." *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 897 (2d Cir. 1983). That standard should be measured from the extraordinary circumstances that triggered it. It was not until March 2026 that the U.S. recognized Acting President Delcy Rodríguez as Venezuela's head of state. Statement of

Interest of the United States, *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 16 Misc. 405 (S.D.N.Y. Mar. 11, 2026), ECF No. 621 at 1. Measured from when the real government gained the U.S. Executive Branch's recognition (and given the massive disruption caused by a national, humanitarian emergency resulting from the June 2026 earthquakes), this motion has been brought within a reasonable time. Any delay arguably present here compares favorably with the delay in *G&A Strategic Investments*, in which the Court vacated the default judgment pursuant to Rule 60(b)(6). *See* 2024 WL 4520067, at *3. The Republic has thus moved swiftly after acquiring the ability to appear. On these facts, and with all doubts resolved in favor of the merits, *Green*, 420 F.3d at 104, the motion is timely.

## II. THE DEFAULT JUDGMENT ALSO IS VOID UNDER RULE 60(b)(4) BECAUSE SERVICE DID NOT COMPLY WITH THE FSIA.

Independent of the discretionary factors addressed above, the judgment is void and must be vacated under Rule 60(b)(4), for which relief is not discretionary. *Irvin v. Harris*, 944 F.3d 63, 68 (2d Cir. 2019) ("Indeed, Rule 60(b)(4) is unique . . . because relief is not discretionary"); *see Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730, 733 n.3 (2d Cir. 1980). Under the FSIA, a court acquires personal jurisdiction over a foreign state through service under § 1608, 28 U.S.C. § 1330(b); *see Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991), and a default judgment entered without it is void. *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 124-25 (2d Cir. 2017).

Service under § 1608(a) demands strict compliance; neither substantial compliance nor actual notice excuses a defect. *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994); *see Republic of Sudan v. Harrison*, 587 U.S. 1, 19 (2019) (in FSIA cases "the rule of law demands adherence to strict requirements"); *In re Terrorist Attacks on Sept. 11, 2001*, 2026 WL 1004493, at *7 (S.D.N.Y. Apr. 14, 2026) (courts require "strict adherence to the terms

of 1608(a)" and "rarely excuse[] defective service"). The statute's four methods operate as an exclusive hierarchy: a plaintiff "must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on," *Neuhauser*, 2023 WL 4350614, at *2. Thus, service through the Secretary of State under § 1608(a)(4) is permissible *only* if "service cannot be made within 30 days under paragraph (3)," 28 U.S.C. § 1608(a)(4), and "[a] plaintiff is not permitted to attempt service under section 1608(a)(4) until it has *properly attempted* service under section 1608(a)(3)." *Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp. 2d 781, 797 (S.D.N.Y. 2008) (emphasis added). Proper service under §1608(a)(3) requires a clerk-dispatched mailing, which in turn requires a signed receipt, sent directly to the foreign minister's office in the foreign state. *Harrison*, 587 U.S. at 8.

Plaintiff never attempted § 1608(a)(3) service. The process ran exclusively through the diplomatic apparatus of the unrecognized Guaidó group and never reached—and was never directed at—the real Venezuelan government now before the Court. Plaintiff proceeded directly to § 1608(a)(4) on the representation that mail service to the foreign minister was "categorically unavailable." (ECF No. 12, at 2-3.) But § 1608(a)(4) is available only "[i]f service cannot be made within 30 days under paragraph (3)," 28 U.S.C. § 1608(a)(4), and strict compliance requires an actual, unsuccessful § 1608(a)(3) mailing—or a genuine demonstration that such a mailing cannot be made—before a plaintiff may resort to service through the Secretary of State. *Hilaturas Miel*, 573 F. Supp. 2d at 797; *see Hirshfeld v. Islamic Republic of Iran*, 235 F. Supp. 3d 45, 48 (D.D.C. 2017) (denying service where the plaintiff "attempted service pursuant to § 1608(a)(4) before attempting service pursuant to § 1608(a)(3)"). A foreign state's generalized objection to service by mail does not itself supply that predicate. Because no § 1608(a)(3) mailing was attempted,

service did not conform to the statute's exclusive hierarchy, the Court lacked personal jurisdiction under § 1330(b), and the judgment is void.

That this Court, in authorizing § 1608(a)(4) service, so ordered Plaintiff's description of § 1608(a)(3) as "appear[ing]" to be categorically unavailable (ECF No. 14 at 2) does not compel a contrary result. That observation was tentative and cannot supply jurisdiction the statute withholds absent conforming service. The proper course is to vacate the judgment and quash service, leaving Plaintiff to perfect service under § 1608(a).

## III. THE COURT SHOULD STAY ENFORCEMENT PENDING RESOLUTION OF THIS MOTION.

Finally, the Court should stay enforcement pending resolution of this motion. A district court has broad discretion to stay enforcement of its own judgment pending disposition of a Rule 60(b) motion, and a stay is particularly appropriate where vacatur would regulate the creditor's enforcement efforts. *See Knox v. Bank of N.Y.*, 508 F. Supp. 2d 249, 251 (S.D.N.Y. 2007) (exercising "its discretion" to stay a proceeding to enforce a default judgment against a sovereign-type debtor because the debtor's pending Rule 60(b) motion, if granted, "would necessarily impact this turnover proceeding seeking enforcement of that judgment"); *Estate of Ungar v. Palestinian Auth.*, 344 F. App'x 631, 632, 634 (2d Cir. 2009) (summary order) (treating a stay of enforcement of a default judgment "until the final resolution of a motion for vacatur" as a proper exercise of the district court's "inherent power . . . to control its own docket"). Plaintiff obtained leave to seek attachment and execution of the Republic's assets. (ECF No. 54.) Although the Republic is not aware of any post-judgment collection efforts—the docket reflects none—Plaintiff may be seeking to execute the judgment without filing evidence of that activity on this Court's docket. Allowing possible execution against the Republic's U.S. property to proceed (whatever Plaintiff's challenges in the process) before the validity of the underlying judgment is resolved could impose significant

burdens on the sovereign Republic in having to address and litigate collection disputes when they are unnecessary at this juncture. Thus, a brief stay pending resolution of a dispositive Rule 60(b) motion is a well justified exercise of the Court's inherent authority to control its docket and avoid unnecessary, wasteful collateral litigation.

**CONCLUSION**

For the foregoing reasons, the Republic respectfully requests that the Court vacate the Default Judgment (ECF No. 49) under Rule 60(b), stay enforcement pending resolution of this motion, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 12, 2026

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

*/s/ Hal S. Shaftel*
Hal S. Shaftel
One Vanderbilt Avenue
New York, NY 10017
Tel: (212) 801-9200
shaftelh@gtlaw.com

*Counsel for Defendant the*
*Bolivarian Republic of Venezuela*

## LOCAL RULE 7.1(c) CERTIFICATION

I, Hal S. Shaftel, an attorney duly admitted to practice before this Court, hereby certify that this Memorandum of Law in Support of Defendant's Motion to Vacate the Default Judgment complies with the word limit set forth in Local Rule 7.1(c), as it contains 8,572 words, excluding those items permitted for exclusion under this Local Rule. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

*/s/ Hal S. Shaftel*
Hal S. Shaftel